JOHN D. WENDORFF, Administrator of Estate of GLADYS T. BULTE, Appellant, v. MISSOURI STATE LIFE INSURANCE COMPANY—1 S. W. (2d) 99.

Division One, December 7, 1927.

*John D. Wendorff* for appellant.

*Jourdan & English* and *McAllister, Humphrey & Pew* for respondent.

366

ELLISON, C.—This is a suit on an accident policy. On the plaintiff's evidence the Jackson County Circuit Court gave a peremptory instruction for defendant and plaintiff appealed. He sues as administrator of Gladys T. Bulte, deceased. The policy was issued by the respondent to August J. Bulte, her husband, insuring him against accidental death or bodily injury, the sum due in event of death to be payable to the wife.

. Among other conditions, the policy obligated the respondent to pay an indemnity of $10,000 for loss of life resulting from bodily injuries effected directly and independently of all other causes solely through accidental means, provided death follow within ninety days. This requirement is referred to hereinafter as the single indemnity provision of the policy. There was still another clause, as follows: "The insurance hereunder shall not cover injuries fatal or non-fatal, . . . sustained by the Insured . . . while in or on any vehicle or mechanical device for aerial navigation, or in falling therefrom or therewith or while operating or handling any such vehicle or device."

The insured met his death while a passenger en route from Miami, Florida, to Bimini in the Bahama Islands, on an aircraft of a type called a seaplane. Because of engine trouble the 'plane was forced to alight at sea and shortly thereafter was capsized by the waves. A few minutes later the lifeless body of the insured was seen floating in the water close by.

The appellant contends the proof of the foregoing facts made a prima-facie case of accidental death by drowning, upon which the

cause should have been submitted to the jury. The respondent maintains that on appellant's own showing recovery is precluded by the "flying machine clause" of the policy. To that appellant rejoins the clause has no application because: (1) the provision refers only to injuries sustained while actually flying in the air; (2) the seaplane was not a flying machine, but a boat or vessel at the time and under the facts involved in this controversy; (3) the insured was not injured either while in the machine or in falling therefrom, but lost his life by drowning.

As the facts are undisputed, the case turns on the construction to be given the policy. We are of the opinion that the casualty came within the stipulated exception and that the conclusion of the trial court was right; but for a proper understanding of the ruling of both courts it is necessary to set out the evidence more fully before discussing the legal questions.

Only one witness testified, Robert L. Moore. He was the owner of the seaplane and aviator on the fatal flight. He was an experienced pilot, and had served with distinction in the combatant air forces during the World War. With a partner he conducted a commercial air line between Miami and the Bahama Islands, under the name *Miami Airways*. The seaplane which figured in the accident bore the name *Miss Miami*. It was constructed in 1919 by the Curtis corporation of Buffalo, New York, and held the speed record from New York to Miami. The craft was constructed with a hull like a boat, 23 feet long, and carried six passengers, including the pilot. The spread of the wings was 76 feet. It was powered with a Liberty motor and air propeller.

To enable the 'plane to mount into the air it was necessary for it to run some distance in gathering speed before leaving the water. Likewise at the end of a flight it would light on the water. To this extent, as well as in furnishing quarters for passengers, the hull was an essential part of the flying equipment. In taking off, the same engine and air propeller were used (and in the same way) to impart the necessary initial velocity that were employed in drawing the vehicle through the air. By running the engine more slowly the craft could be made to move along the water without rising. This was called "taxiing." In this way it was possible to use the seaplane like a boat. The witness referred to the 'plane several times as a boat—said it "was a worthy boat, designed to meet and stand all conditions at sea;" that it "was employed as a flying machine or as a boat, as you like;" and that it was "a combination seaplane, both air and water." He further said that by manipulation of the hinged winged surfaces of the plane, they could be made to serve as sails, and that, on one occasion when he had been compelled

to make a forced landing at sea, he had, by that means and skillful navigation, been able to sail twenty miles into the harbor of Nassau.

For the trip from Miami to Bimini on the morning of March 22, 1922, the *Miss Miami* was chartered by the insured, Mr. Bulte, the intestate, Mrs. Bulte, a Mr. and Mrs. Smith and a Miss Dixon. The distance is 52 miles; the flying time a little over 30 minutes. The trip is over sea and is made by air without intermediate landing except in case of mechanical trouble. On this particular occasion the flight would have continued straight through to Bimini but for motor trouble which developed en route and forced the seaplane down; but the story of the flight is best told in the language of the witness:

"We left the water at 11:04 by the clock. At 11:50 motor trouble developed, giving absolutely no warning whatsoever, the motor was absolutely dead, having just passed a schooner a few minutes before, and I happened to know the captain; I signaled him I was all right by moving the wings. I had seen my port for quite sometime, it was only eight and a half miles to Bimini. As I said before, trouble developed and I was obliged to volplane down. In landing, landing was very difficult, very hard in the extreme condition, as the sea was raging at this time from six to eight feet, approximately ten feet high some waves were, as in the gulf streams every third wave is the largest, by coming in the drive wave, I managed to make a decent landing; the waves were breaking high, sometimes entirely over the machine, each time taking in a little water.

"By taking the motor cover carried in the hull and placing it over the passengers so water would run over the hatch covers and not run into the cock-pit, I thought this would enable me to devote some time to the trouble. A huge wave hit the wing of the machine causing the boat to list to the extreme right side, naturally filling the cock-pit full of water, acting as a pivot, the motor being on top and top heavy, it acted as a pivot and turned completely over. When I came out of the hatch cover, I managed to find my way up by feeling, to the surface.

"I noticed Mrs. Bulte within a few feet of the left wing and Mrs. Smith perhaps fifty feet and Mr. Smith a hundred feet, the three, apparently none could swim. Mrs. Bulte was the first I pulled up on the wreckage, Mrs. Smith was next and Mr. Smith followed. This was in the keel of the boat. Mrs. Bulte inquired about her husband, she remarked, 'My God, where is my husband.' I assured them everything was all right and not to worry, that things of this kind often happened and that it was nothing unusual and we would be picked up shortly. I dived into the cockpit and tried to locate the bodies of Miss Dixon and Mr. Bulte, those two bodies didn't appear on the surface of the water, when I came up, being nearly exhausted I rested a few minutes and made another dive, but the bodies were not to be found any place.

"At this particular time I noticed a rope blowing by the wing and when it swung around and came back, I tied the rope to the keel of the machine; there is a brace on the keel of the machine about the space of two inches you can stick your finger in, and by running the end of the rope through that, I managed to secure it in that position, I tied Mrs. Smith and Mrs. Bulte on the wreckage. At this particular time I noticed Bulte's body come floating by; I stood in front of the two ladies to obstruct their view of the body. I watched the body until it was at least one hundred feet past. . . . I noticed the body was bleeding at the head, seemed to be a scar directly over the right eye, the body was tossed into the air, in fact it was so close it nearly hit the machine."

The witness continued by narrating the harrowing details of the struggles of the remaining members of the shipwrecked party and told of the death of Mrs. Smith and Mrs. Bulte about midnight. This need not be repeated. It should be stated, however, that at one point he said none of the passengers were injured in making the forced landing, and that everyone seemed to be in good spirits and jolly until the boat turned over. He said, also, that it was about ten minutes from the time the boat came down on the water until it capsized, and about the same time thereafter when he saw Mr. Bulte's remains. This, we think, sufficiently reviews the evidence.

I. Taking up the points made by appellant in their order, we agree the proof of involuntary drowning made a prima-facie case of accidental death under the single indemnity provision of the policy; and this is true, so far as concerns that particular provision, no matter what the cause of the insured's falling in the water. [Kahn v. Met. Casualty Ins. Co., 240 S. W. 798; Manufacturers' Indemnity Co. v. Dorgan, 58 Fed. 954, 7 C. C. A. 581, 22 L. R. A. 620; 5 Joyce on Law of Insurance (2 Ed.) sec. 2833, p. 4906; sec. 2837, p. 4914; sec. 2880, p. 5019-21; sec. 2881, p. 5021.]

Against this prima-facie case, the respondent invoked the mooted flying machine clause. The defense thus tendered was an affirmative defense, and, as appellant says, the burden was on respondent to establish it. [Griffith v. Continental Casualty Co., 290 Mo. 461, 235 S. W. 83; Fetter v. Casualty Co., 174 Mo. 269, 73 S. W. 596, 97 Am. St. 560, 61 L. R. A. 459.] It is, furthermore, the general rule in such circumstances that the plaintiff's case cannot be taken from the jury, for he has the right to have the jury pass on the credibility of the defendant's witnesses and the weight of their testimony, though uncontroverted. [Peterson v. C. & A. Ry. Co., 265 Mo. 479, 178 S. W. 182.] But the rule has its exceptions. When the proof is documentary, or the defendant relies on the plaintiff's own evidential

showing (or evidence which the plaintiff admits to be true) and the reasonable inferences therefrom all point one way, there is no issue of fact to be submitted to the jury. [Darlington Lumber Co. v. Mo. Pac. Ry. Co., 243 Mo. 245, 147 S. W. 1052; Linderman v. Carmin, 255 Mo. 62, 164 S. W. .614; Warren v. N. Y. Life Ins. Co., 182 S. W. 98; Richey v. W. O. W., 163 Mo. App. 246, 146 S. W. 461.]

That was the situation in the instant case. The only questions to be determined were and are whether, under the admitted facts— from appellant's standpoint—the seaplane was a flying machine within the meaning of the policy provision, and if so whether the insured, in falling from the floating craft and drowning, lost his life in the manner contemplated by the clause. These were both questions of law arising on a construction of the policy, and were to be determined by the court, not by the jury. [Roach-Manigan Paving Co. v. Southwestern Ins. Co. (Mo.), 238 S. W. 121; Trimble v. Edwards (Mo. App.), 281 S. W. 122.] If the trial court correctly ruled in deciding both questions in the affirmative, there was no jury case; but if on either question it erred in so ruling, the cause should have been submitted to the jury on plaintiff's prima-facie case of accidental drowning, for appellant had the burden on that issue and the respondent's answer contained a general denial.

In the construction of the policy, the rules to be followed are well settled. The policy is a contract. Plain and unambiguous language must be given its plain meaning. The contract should be construed as a whole; but insofar as open to different constructions, that most favorable to the insured must be adopted. [State ex rel. Security Ins. Co. v. Allen, 305 Mo. 614 et seq., 267 S. W. 381.] However, as said in 14 Ruling Case Law, sec. 103, p. 931, the rule "does not authorize a perversion of language, or the exercise of inventive powers for the purpose of creating an ambiguity where none exists."

Appellant has cited a line of cases holding the law abhors forfeitures. Respondent replies that that doctrine, which is unquestioned, has no application to the flying machine clause, because it is not a forfeiture provision. We think respondent's view is correct. The clause rather states an excepted risk. [Greenleaf v. Ins. Co., 37 Mo. 31; Jagoe v. Aetna Ins. Co., 123 Ky. 510, 96 S. W. 599 et seq.] It is not intended that aeronautic activities of the kind specified shall void the policy, but merely that the insurance coverage shall not extend to an accident sustained in that way. However, the distinction is academic, for the restrictive provisions of the contract are to be strictly construed whether of the one class or the other. [State ex rel. v. Allen, 305 Mo. l. c. 615; 1 Joyce, Law of Insurance (2 Ed.), sec. 220, pp. 574, 579.]

But the rule of strict construction does not prevent the application, within proper limits, of the further principle "that policies of

insurance, like other contracts, must receive a reasonable interpretation consonant with the apparent object and plain intent of the parties.'' [14 R. C. L. sec. 103, p. 932.] Both appellant and respondent invoke that principle here, and cite Long v. St. Joseph Life Ins. Co. (Mo.), 248 S. W. 923. The policy in that case limited the liability of the insurer against death of the insured while ''engaged in any military or naval service in time of war.'' The insured died of pneumonia induced by influenza while at home on a furlough after the Armistice, and it was held the plaintiff could recover, this court saying: ''That provision of the policy must be interpreted with an understanding of the general purpose of the contract. Against what contingencies did the insurer intend to protect itself? It is plain that it did not intend to except from the hazards, against which it undertook to insure, the ordinary risks of military life, such risks as attended the performance of any kind of military duty in circumstances of peace. It was only the hazards of war that were excepted.''

II. Now to make concrete application of the discussion thus far. The appellant likens the hazards of peace time military service, which were ruled within the risk in the Long case, to the hazards of surface navigation, in this; and the hazards of war, which were excepted in the Long case, to the hazards of air flight, in this. On this line of reasoning he reaches the conclusion that the policy exception refers only to accidents in the air. But we cannot agree the situations are analogous, or that such is a fair construction of the policy. Obviously, the general purpose of the clause was to exempt the insurer from liability for accidents occuring in aeronautics because of the extraordinary hazards incident thereto (Meredith v. Accident Assn., 252 S. W. 978); and that these hazards are not confined to the mere operation of flying in the air seems apparent from the testimony in this case, as well as from many tragic incidents in very recent current history. [See State ex inf. v. Dallmeyer, 295 Mo. 644, 245 S. W. 1068; Allen v. C. B. & Q. Railroad Co., 313 Mo. 61, 281 S. W. 742.]

Furthermore, the clause by its plain terms does not except alone injuries suffered while navigating the air. It specifies injuries sustained while *in or on any vehicle or mechanical device for* aerial navigation, or *in falling therefrom or therewith,* or while *operating or handling* any such vehicle. Unless we do violence to the unequivocal language used, we must hold, as we do, that it covers activities on the ground, or water, as well as in the air when connected with the use of the machine in aeronautics. In taking off for a flight a seaplane must attain a certain speed on the water, and to slow down and stop it must light on the water. These are indispensable parts of the movement. In Pittman v. Lamar Life Ins. Co., 17 Fed. (2d) 370, the in-

sured, following an air trip, descended from his airplane and walked around the front thereof toward his automobile. He was struck by the airplane propeller and killed. It was held he was engaged in "aeronautic activity." The court said: "The aeronautic activities of one who takes such a trip do not begin or end with the actual flight, but include his presence or movements in or near to the machine incidental to beginning or concluding the trip." In the same way, if a flight is interrupted by mechanical trouble necessitating an involuntary, or forced, landing, the interval during which the craft is supported by the watery element instead of the air, is as much a part of the flying trip as any other. We are clearly of the opinion that the clause in controversy applies to aircraft in the situation shown to have existed in this case.

III. But it is said the seaplane was a vessel and not a flying machine at the time of the accident, and that the clause has no application for that reason. In this connection attention is called to Sec. 3, Title 1, U. S. C. A., which says the "the word 'vessel' includes every description of water craft or artificial contrivance used, or capable of being used, as a means of transportation on water." This statute has been held by the United States and other courts to refer to navigable structures of widely different types, but it is to be remembered the definition is a code definition enacted for legislative purposes. In nearly every instance in which it has been applied, so far as our research discloses, the immediate question involved was one of admiralty jurisdiction.

In The Crawford Bros. No. 2, 215 Fed. 269, it was held an airplane was not subject to libel *in rem* for repairs under admiralty law. In Reinhardt v. Newport Flying Service Corporation, 232 N. Y. 115, 133 N. E. 371, 18 A. L. R. 1324, a seaplane was moored in navigable waters and began to drag anchor. The claimant waded out to rescue it and was struck by the propeller. It was ruled the craft, while afloat, was subject to "the tribunals of the sea," and that the claim did not come under the New York Workmen's Compensation Act. The court said: "We think the jurisdiction of the admiralty is not less where the structure found afloat is seaplane and aeroplane combined." In People v. Smith, 196 N. Y. Supp. 242, 119 Misc. 294, it was decided a seaplane was not a floating structure within a state statute forbidding the operation without a muffler of any boat, barge, vessel or other floating structure propelled by an internal combustion engine, on certain waters of the State; but this holding was later reversed in 199 N. Y. Supp. 942, on authority of the Reinhardt case.

It seems plain that for certain purposes, such as enforcement of harbor regulations and laws of the sea, there is good reason why a floating seaplane should be subject to maritime rules. But does it

follow that such a craft on the water always wholly loses its character as a flying machine? We think not. A seaplane is amphibious. It can float and move on the water but its primary function is to navigate the air. If admiralty may disregard this latter function in dealing with the machine on facts bringing it within the range of that jurisdiction, why may it not also be regarded as an air vehicle when being used as such, though afloat, if that aspect of its dual nature is involved? An insurance policy, not a statute, is to be looked to in this case. The purpose of the policy provision is evident. The craft was a "mechanical device for aerial navigation." We cannot hold it any the less that because forced down on the water at the time of the accident.

IV. The final contention of appellant is that the insured was not injured either while in the seaplane or in falling therefrom but met his death by drowning. As already observed, if it were necessary to consult only the single indemnity provision of the policy that contention would be well founded, for the law would regard drowning as the efficient, predominant cause of death. But a subsequent clause specifically excepts accidental injuries, fatal or non-fatal, sustained in falling from a machine for aerial navigation. If the insured had fallen from an airplane to the ground and been killed, the applicability of the provision would hardly be questioned, and this without regard to whether the plane was in the air or rolling along the ground at the beginning or ending of a flight. We can see no reason why the exception should not be equally binding under the facts here. The ultimate cause of death in the one case would be crushing, in the other it is drowning; but both would result from the same producing case—falling from a flying machine.

These views lead to affirmance of the judgment below. *Lindsay* and *Seddon, CC.,* concur.

PER CURIAM:—The foregoing opinion by ELLISON, C., is adopted as the opinion of the court. All of the judges concur.