KATE BRANNAKER, PLAINTIFF IN ERROR,. v. PRUDENTIAL INSURANCE COMPANY OF AMERICA, DEFENDANT IN ERROR.—150 S. W. (2d) 498.

St. Louis Court of Appeals.   Opinion Filed May 6, 1941.

Motion for rehearing overruled May 20, 1941.

Writ of Certiorari denied by Supreme Court, June 30, 1941.

*F. X. Cleary* and *John P. Griffin* for plaintiff in error.

*Fordyce, White, Mayne, Williams & Hartman, William H. Mc-Bratney, Michaels, Blackmar, Newkirk, Eager & Swanson* and *Kenneth E. Midgley* for defendant in error.

*Ralph W. Hyatt* of counsel.

SUTTON, C.—This is an action on three policies of insurance issued by defendant on the life of plaintiff's daughter, Bernice Brannaker. Ordinary death benefits were paid, and this action is to recover accidental death benefits. Each of the policies contains the agreement that, "upon receipt of due proof that insured has sustained bodily injury, solely through external, violent, and accidental means, resulting in the death of the insured within ninety days from the date of such bodily injury, the company will pay, in addition to any other sums due under this policy, a sum equal to the face amount of insurance stated in this policy." Plaintiff is the beneficiary named in the policies.

Plaintiff in her petition charges that "the insured died as the result of external, violent, and accidental means, to-wit, accidentally and unintentionally drinking polluted and poisonous water containing poison or germs which caused her death by infecting and perforating her stomach and intestines."

The cause was tried to a jury. At the close of plaintiff's case the court at the instance of defendant gave to the jury an instruction in the nature of a demurrer to the evidence. Plaintiff took an involuntary nonsuit, and later unsuccessfully moved to set the same aside. She has brought the case here by writ of error.

The insured was a member of a church social group in St. Louis called the Sodality Girls, which met once a month at the church on the first Monday. At the May meeting in 1933, it was arranged that

the girls would go on a hike on May 21st. On that day about thirty of the girls met at the church and left about eight o'clock for their outing. They took the street car to the end of the line at Meramec Highlands in St. Louis County and walked from Meramec Highlands to the Meramec Quarry. They all had their lunches with them.

Four witnesses testified concerning several of the girls drinking water. One said some, including insured, drank perfectly clear running water about twenty feet from the quarry pit. Another said that they drank running water that happened to be clear, but couldn't say whether it was in the quarry or where it was. Another said that they found and followed a stream for a half mile and drank clear water there. Another testified that they found a stream and knew that the water wouldn't be very good there and followed it to its source about a mile from the quarry where it was bubbling out of a rock. They said they didn't think the water would be very good, but wanted it, drank some, and it seemed all right. There was a little stand near the quarry where soda water was kept covered with ice in an old wooden ice box, and some of the girls drank that.

Some ten, twelve, or thirteen of the girls who went on the trip became sick with typhoid fever ten days or two weeks later. The insured became sick on June 8th or 10th.

Plaintiff put in evidence a certificate of death made by the attending physician, showing that the insured died on June 22, 1933, and that the principal cause of death was typhoid fever, and the contributory cause was hemorrhage and perforation of the bowel. Plaintiff also put in evidence certificates of death, showing that two other girls who went on the outing died of typhoid fever, one on June 22, 1933, and the other on July 1, 1933.

According to the medical testimony given on behalf of plaintiff, the period varies after water polluted with typhoid germs is taken into the stomach before the germs take effect. The usual time is from a week to a month depending on how rapidly the typhoid germs get through the intestines into the blood stream. There have been cases of three days, seven days, and ten days, but they run as high as a month before the symptoms make themselves known. The germs are taken with food or drink. The stomach does not destroy the germs, and they pass into the intestines. Typhoid fever is a disease of the small intestines. It is an acute, infectious, contagious, disease. The germs affect the intestines by setting up an inflammation in the intestines which involves the mucous membrane or lining of the intestines. Ulcers are formed and break through and cause hemorrhage. They are eating sores that perforate the bowel. Hemorrhage indicates that a typhoid ulcer has eaten into an artery in the bowel. Perforation of the bowel happens frequently but not in all cases. The only way typhoid fever can be contracted is by taking the germs into the system either by food or drink. One cannot contract typhoid fever by scratching his hand or injuring himself otherwise. When a perforation or

hemorrhage occurs, it is the natural result of the disease. The perforation does not result from trauma. The germs first form an ulcer, and then a perforation. The medical profession recognizes a distinction between poison and bacteria. When death is caused by poison as such it is almost instantaneous. Bacteria will work on the food and create a poison in the food before it is taken into the stomach. Then there is a chemical poison plus bacteria poison, like eating poisoned sausage. This is known as ptomaine poison. Typhoid germs grow and come out through the bowel movement, and thus may contaminate wells and cisterns and small streams where there are privies near the stream. When germs are taken into the stomach they are found in the intestines, which are proper media for their multiplication and growth. Before symptoms appear the germs are multiplying all the time, but they have not created enough involvement in the bowel to get into the system. They are running through the intestines. If the germs do not enter the system, the patient is not conscious of them. The germs do not need diseased or ruptured conditions in the body to react on the system. Typhoid in medical circles is referred to as a specific infectious disease.

Plaintiff contends that this evidence shows that insured's death resulted from a bodily injury sustained solely through external, violent, and accidental means, within the meaning of the policies sued on.

In State ex rel. Prudential Insurance Company v. Shain, 127 S. W. (2d) 675, our Supreme Court, speaking through Judge DOUGLAS, stated the applicable rule, as follows:

"Where there is no ambiguity, there is no room for construction. Unequivocal language is to be given its plain meaning though found in an insurance contract. [State ex rel. New York Life Insurance Co. v. Trimble, 306 Mo. 295, 267 S. W. 876.] This is so even when considering a restrictive provision of a policy. [Wendorff v. Missouri State Life Insurance Co., 318 Mo. 363, 1 S. W. (2d) 99.] Needless to say, we are confined to our own decisions in reviewing for conflict, but in determining whether the language of a policy is ambiguous, since we have not previously considered the same or similar language, we may look to the decisions of other states. This is for the reason that the rule is settled throughout the nation as well as in this State that the terms of a contract of insurance, like other contracts, ought to be taken, understood and given effect in their plain, ordinary and popular sense."

The same rule was stated by Judge CARDOZO in Bird v. St. Paul Fire and Marine Insurance Co., 224 N. Y. 47, 120 N. E. 86. That was a suit to recover on a fire insurance policy covering a vessel which was injured by force of an explosion in a fire one thousand feet away. Judge CARDOZO, denying recovery, said:

"The problem before us is not one of philosophy. . . . If it were, there might be no escape from the conclusion of the court below.

. . . Our guide is the reasonable expectation and purpose of the ordinary business man when making an ordinary business contract. It is his intention, expressed or fairly to be inferred, that counts. There are times when the law permits us to go far back in tracing events to causes. The inquiry for us is how far the parties to this contract intended us to go. The causes within their contemplation are the only causes that concern us. . . . A common-sense appraisement of everyday forms of speech and modes of thought must tell us when to stop. . . . The question is not what men ought to think of as a cause. The question is what they do think of as a cause. We must put ourselves in the place of the average owner whose boat or building is damaged by the concussion of a distant explosion, let us say a mile away. Some glassware in his pantry is thrown down and broken. It would probably never occur to him that, within the meaning of his policy of insurance, he had suffered loss by fire. A philosopher or a lawyer might persuade him that he had, but he would not believe it until they told him.''

So, recurring to the present case, would the average man purchasing an insurance policy be likely to think or believe that in the event of his death from typhoid fever his beneficiary would be entitled to recover as for death resulting from injury sustained through external, violent and accidental means?

In the Prudential Life Insurance Company case the insured's death resulted from typhoid fever contracted through drinking polluted water from an old well in his back yard. The policy insured against the death of the insured as a result, directly and independently of all other causes, of bodily injuries, effected solely through external, violent and accidental means, specifically excluding, however, death resulting directly or indirectly from disease in any form. The court denied recovery on the ground that the insured's death resulted from disease and not from injury.

Since there is no specific exclusion provision in the policies with which we are here concerned the right or not of plaintiff to recover must be determined solely by the insuring provision of the policies. It is clear the insuring provision, construing its terms in their popular sense, does not grant insurance against death resulting from disease contracted through accidental means, but grants insurance against death resulting from injury sustained through accidental means. Plaintiff must recover, if at all, upon the insurance granted, not upon the absence of a specific exclusion of insurance not granted.

There are cases, relied on by plaintiff, holding that where an insured suffers an injury, such as a wound, or the bite of a dog or insect, and a disease resulting from such injury causes the death of the insured, the injury is the proximate cause of death, and the beneficiary is entitled to recover as for death resulting from an injury sustained through accidental means. But we have no such case before us here. There is a wide difference between a case where an accident causes an

injury resulting in a disease, and a case where an accident causes a disease resulting in an injury. The distinction is not fanciful or theoretical. It is real and practical. · Its proper observance leads to a construction of the insuring provision in accordance with the popular understanding of its terms.

Cases relied on by plaintiff, involving the unintentional taking of poison, such as carbolic acid, arsenic, strychnine, morphine, or ptomaine, are not in point here. Such poisons when taken react at once upon the tissues of the body. . They have an immediate damaging or destructive effect upon the tissues resulting from contact therewith. And death resulting from the unintentional taking of such poisons is popularly regarded as accidental.

Cases involving compensation laws and employers' liability policies are not in point.

It will be helped in this connection to quote further from the Prudential Insurance Company case, as follows:

"In this case respondents say that taking the germs caused an injury which in turn resulted in the disease, therefore death was due to injury and not to disease, so was not within the exclusion clause. Would this result be reached if the clause was viewed in the light of common understanding as revealed in the common speech of men which is the test that must be applied? We think not. Common understanding would force the conclusion that typhoid fever, the disease, was the proximate, procuring cause of death. Any bodily injuries suffered were an incident of the disease. Respondents' construction fails to give effect to the plain words of the policy which exclude death which results from disease. To uphold such a construction would decree that all death from disease would be covered by the policy because a normal person would not intentionally expose himself to the bacteria which cause disease. Therefore, contracting disease would always be accidental. There would then be no difference between an accident and a health policy. [Burns v. Employers' Liability Assurance Corporation, Ltd., 134 Ohio St. 222, 16 N. E. (2d) 316, 117 A. L. R. 733; Chase v. Business Men's Assurance Co. of America, 10 Cir., 51 F. (2d) 34.] In the latter case the identical question under practically the same policy provisions was presented for decision. The court, denying recovery on the policy, said that the ordinary man draws a clear distinction between bodily injury and disease and that under the exclusion clause the policy did not cover death resulting from typhoid fever, which was a disease not brought about by accidental bodily injuries. The above decision appears to be the only one at this writing which is entirely in point."

·It thus appears that, though in that case there was in the policy a specific exclusion of disease, it was nevertheless definitely ruled that typhoid fever is a disease not an injury. But does the average man need to be told in specific words that insurance against injury sus-

tained solely through external, violent and accidental means is not insurance against disease?

So, in Burns v. The Employers' Liability Assurance Corporation, 134 Ohio St. 222, it was held that death due to amebic dysentery, contracted from drinking water which had been polluted by the breaking of the sewer pipe in a hotel, was not included within the coverage of a policy insuring against "bodily injuries sustained solely and independently of all other causes through accidental means," with no specific exclusion of disease. The court, in so holding, said:

"Certainly, a disease such as pneumonia or typhoid fever is not thought of in everyday language as a. bodily injury. As said by Judge CARDOZO in Connelly v. Hunt Furniture Co., 240 N. Y. 83, 85, 147 N. E. 366, 39 A. L. R. 867:

" 'We attempt no scientifically exact discrimination between accident and disease or between disease and injury. None perhaps is possible, for the two concepts are not always exclusive, the one of the other, but often overlap. . . . Germs may indeed be inhaled through the nose or mouth, or absorbed into the system through normal channels of entry. In such cases their inroads will seldom, if ever, be assignable to a determinate or single act, identified in space or time (Matter of Jeffreyes v. Sager Co., 198 App. Div. 446, 233 N. Y. 535). For this as well as for the reason that the absorption is incidental to a bodily process both natural and normal, their action presents itself to the mind as a disease and not an accident.'

"Yet to uphold the contention of appellee would compel us to say that if the disease was due to any mishap recovery may be had, but not otherwise. Logically this would lead to the conclusion that all diseases are bodily injuries. There would be no difference between an accident policy and a health policy, except insofar as it would be necessary to trace the cause in the former to some mischance.

"In this case Burns died of amebic dysentery. That is produced by a small parasite of from fifteen to eighty microns in diameter. It is a single celled parasite, and the only type of amebae pathogenic to man. Generally, when in the body, it produces pathological lesions in the intestines, other organs and tissues. There is still considerable difference of opinion as to just how the lesions are produced. . . .

"At any rate these small one cellular parasites produce a degeneration of the tissues that, in some cases, results in death. All diseases produce a somewhat similar degeneration, and to include all diseases as bodily injuries seems to ignore the common meaning of the words.

"Although the cause was decided because of a specific exclusion in the policy, the language of Judge PHILLIPS in Chase v. Business Men's Assurance Co., supra, at page 36, seems pertinent:

" 'In the ordinary sense of the words, we do not regard the contracting of an infectious disease, through the normal consumption of food, air or water infested with bacilli which causes such disease, as the

suffering of bodily injuries from accidental means. We regard it, rather as the contracting of a disease. In their ordinary and popular sense, the phrase ''bodily injuries'' conveys the idea of a cut, a bruise or a wound rather than a physical impairment caused by disease.'

''Pneumonia, typhoid fever, scarlet fever and the like, are diseases due solely to germs. To call them bodily injuries is to establish a new nomenclature and classification not generally used in ordinary conversation.

''The words 'bodily injury' are commonly and ordinarily used to designate an injury caused by external violence, and they are not used to indicate disease. We do not speak of sickness as an accident or an injury. When we hear that someone has suffered an accident, we conclude that he has suffered, more or less, some external violent bodily injury. Since the words 'bodily injury' are used in the policy in their common and accepted meaning, it is only by a strained and illogical construction of the words that they can be held to include a disease not resulting from some external violence. We do not think of one suffering from typhoid fever as being bedridden as the result of an accident or injury.''

Our conclusion necessarily is that defendant's instruction in the nature of a demurrer to the evidence was properly given, and the judgment below should be affirmed.

PER CURIAM:—The foregoing opinion of SUTTON, C., is adopted as the opinion of the court. The judgment of the circuit court is accordingly affirmed. *Hughes, P. J.,* and *McCullen* and *Anderson, JJ.,* concur.