**WORLD INVESTMENT COMPANY, a Corporation, (Plaintiff) Respondent,**

v.

**MANCHESTER INSURANCE & INDEMNITY COMPANY, a Corporation, (Defendant) Appellant.**

**No. 31431.**

St. Louis Court of Appeals.

Missouri.

June 15, 1964.

---

Goldenhersh, Goldenhersh, Frederichs, Newman & Lane, Leo M. Newman, Frank J. Lane, Jr., St. Louis, for defendant-appellant.

Armstrong, Teasdale, Roos, Kramer & Vaughan, William H. Webster, Bruce E. Woodruff, St. Louis, for plaintiff-respondent.

DOERNER, Commissioner.

This is an action on an automobile insurance policy to recover for a loss resulting from a claimed theft of the car. Defendant appeals from a judgment which, after remittitur of amounts awarded by the jury for vexatious delay and attorneys' fees, is for $2182, together with interest thereon of $327.84, or a total of $2509.84.

The material facts are these: On October 17, 1957, Keith L. Milburn, a self-employed trucker who resided in East St. Louis, Illinois, purchased from East Side Motors, Inc., of that city, under a conditional sale contract, a new 1957 Cadillac sedan. After credit for a trade-in the balance owed by Milburn was $4805. The conditional sale contract executed by Milburn provided that the title to the car was not to pass to him until he completed payment of 29 monthly installments of $105 and a final monthly payment of $1760, the first to be due on November 17, 1957.

On the same day the conditional sale contract was signed by Milburn, or shortly thereafter (the exact date is not in evidence), East Side Motors executed an assignment printed on the instrument, whereby it assigned the conditional sale contract to plaintiff World Investment Company of St. Louis. Milburn paid World Investment the monthly installments of $105 as they fell due, including that for November, 1959. Because of business reverses he had suffered, Milburn found that the payments were becoming too heavy a financial burden, and decided to "trade-down" for a less expensive car. After contacting numerous other used car dealers in St. Louis and East St. Louis, Milburn called on Roberts Auto Sales of St. Louis on November 28, 1959, where he talked to a salesman named Lou Skelton. When Skelton was told the object of Milburn's visit and the balance due, Skelton stated that there was too much owed on the Cadillac for a trade-down. Skelton offered, instead, to sell Milburn an older car and to endeavor to find a buyer for the Cadillac. The end result was that Milburn purchased from Roberts Auto Sales a 1955 Buick for a down payment of $20 and monthly payments of $36; and Milburn delivered his Cadillac to Skelton on the understanding that Skelton would find a purchaser of it at a price which was to be subject to Milburn's approval, and sufficient to pay off the amount owed World Investment. According to Milburn it was agreed that the car was not to be taken off of the lot except for demonstration purposes, in which event Skelton was to accompany the prospective purchaser. Milburn testified that Skelton also promised that he would pay World Investment any installment that fell due before the Cadillac was sold, and Milburn agreed that if there was any profit made on the sale of the automobile, it would be split between them. On the foregoing understanding Milburn delivered the Cadillac and the keys thereto to Skelton.

Thereafter Milburn telephoned Skelton once to ascertain what progress was being made, and late in December, 1959, Skelton stopped by Milburn's home to tell him that no buyer had been found, but that several persons were interested in the car. The evidence indicates that on December 14, 1959, Skelton paid World Investment the installment then due. After the January, 1960 installment fell due and became delinquent, World Investment write Milburn

demanding payment. Milburn telephoned Roberts Sales and was told that Skelton had not been there for a week and had taken the Cadillac with him. Subsequent extensive efforts by Milburn and World Investment to locate Skelton or the car, through the police, the Federal Bureau of Investigation, and other sources, were of no avail.

At the time Milburn first purchased the car he obtained an automobile physical damage policy of insurance, which insured him for one year. The policy was renewed each year, that in suit covering the period from October 16, 1959 to October 16, 1960. Milburn and his wife, Shirley, were named therein as insureds, and it was further provided in the appropriate space in the policy: "Loss Payee: Any loss hereunder is payable as interest may appear to the insured and World Investment Co." As stated, coverage under the comprehensive coverage clause of the policy included loss by "theft." The policy also contained an exclusion clause which provided that the coverage did not apply "to loss due to conversion, embezzlement or secretion by any person in possession of the automobile under a bailment lease, conditional sale, purchase agreement, mortgage or other encumbrance; * * *." The amount owed by Milburn on the conditional sale contract at the time he learned of the loss, including the January, 1960 installment, was $2182, the sum for which World Investment sued, together with interest thereon.

Defendant's primary point is that there was no evidence of a "theft" of the automobile within the meaning of that word as used in the policy. Defendant equates the term "theft" with that of "larceny," and maintains that since Milburn voluntarily delivered the car to Skelton, there was no felonious taking, an essential element of larceny. Cox v. World Fire & Marine Insurance Co., Mo.App., 239 S.W.2d 538, and Eiswirth Construction & Equipment Co. v. Glenn Falls Insurance Co., 241 Mo.App. 713, 240 S.W.2d 973, are cited by defendant, but those cases furnish no support for de-

fendant's position. For example, in Cox v. World Fire & Marine Insurance Co., supra, we said that in construing a contract of insurance its words must be given the ordinary meaning that they carry in common usage. Wendorff v. Missouri State Life Insurance Co., 318 Mo. 363, 1 S.W.2d 99, 57 A.L.R. 615. In Eiswirth Construction & Equipment Co. v. Glenn Falls Insurance Co., supra, we held that the word "theft" as used in the policy must be interpreted in its plain, ordinary and popular sense, and not in a technical sense; and that as generally and commonly used and understood it conveyed the same meaning as the term "steal." And that word, as we pointed out, in its popular and broader or colloquial sense may signify a wrongful conversion as well as an unlawful taking.

█ We adhere to the view expressed in those cases that where, as here, there is no definition of the word "theft" in the policy it must be given that connotation it conveys in popular and common usage. We cannot agree with defendant, therefore, that the word is synonymous with that of "larceny." If they have precisely the same meaning then why, we may ask, did defendant employ both in the phrase "theft, larceny, robbery or pilferage," which appears in another paragraph of the contract? The use of both would indicate that defendant believed there was a distinction between them when it wrote the policy. We think there is, and share the view expressed in Blashfield, Cyclopedia of Automobile Law & Practice, Perm.Ed., Vol. 6, Part 1, § 3712, p. 316, that " 'Larceny,' it has been pointed out, is a technical term, while 'theft' is one of common usage." As various standard dictionaries point out, in popular usage "theft" is a broader term than "larceny" and includes other forms of the wrongful deprivation of property, including conversion and embezzlement. 3 Bouv. Law Dictionary, Rawles 3rd Ed., p. 3267; Black's Law Dictionary, 4th Ed., p. 1648; Merriam-Webster New International Dictionary, 2nd Ed., p. 2618.

■■ We stated in Eiswirth Construction & Equipment Co. v. Glenn Falls Insurance Co., supra, that we do not regard the word "theft" as used in a similar policy as an ambiguous term. It would avail defendant nothing if we did. For it is the long established law of this state that where there is doubt or uncertainty as to the meaning of language used in a contract of insurance, one favorable to the insured and the other favorable to the insurer, that which is favorable to the insured will be adopted. Cain v. Robinson Lumber Co., 365 Mo. 1238, 295 S.W.2d 388; Pierce v. Business Men's Assur. Co. of Amer., Mo., 333 S.W.2d 97; Wendorff v. Missouri State Life Insurance Co., 318 Mo. 363, 1 S.W.2d 99. We have concluded, therefore, that plaintiff's evidence was sufficient to make a submissible case on the issue of whether a theft of the automobile was committed. We believe that conclusion accords with the majority rule as stated in the exhaustive discussion of the subject to be found in 48 A.L.R.2d 12, et seq. It is also in accord with our present statutory definition of the word "steal," Sec. 560.156 RSMo.1959, V.A.M.S. But for the purpose of this case we prefer to rest our decision on the grounds stated.

■ Defendant next points to the exclusion clause in the policy and argues that its apparent intent was to exclude coverage when the insured voluntarily relinquished possession and control of the automobile to another whose character was unknown to defendant. But the exclusion clause obviously is not that broad. Compare Mock v. Missouri Union Insurance Co., Mo.App., 328 S.W.2d 61. It provides that the policy does not apply when the insured has relinquished possession to another under some form of encumbrance, as a bailment lease (what we usually term a lease-purchase agreement, see Words and Phrases), conditional sale contract, or mortgage. Milburn did not deliver possession to Skelton under an encumbrance; it was given under a bailment for the purpose of finding a purchaser. If defendant desired an exclu-

sion clause as broad as that involved in Mock v. Missouri Union Insurance Co., supra, it should have written one into its policy. We certainly have no authority to rewrite defendant's contract for it. Prange v. International Life Insurance Co. of St. Louis, 329 Mo. 651, 46 S.W.2d 523, 80 A.L.R. 950; State Mut. Life Assur. Co. of Worchester, Mass. v. Dischinger, Mo., 263 S.W.2d 394.

■■ When Milburn bought the Cadillac from East Side Motors Inc. in 1957 he signed the conditional sale contract, but instructed the dealer to have the title put in his wife's name to protect it from liability in case his business should fail. East Side Motors so registered the car, but kept the certificate of title in its possession until the car disappeared, when plaintiff obtained it and first learned that the certificate had been issued in the name of Mrs. Milburn. The certificate showed that the vehicle was subject to a conditional sales lien for $4805 in favor of East Side Motors. The policy in suit, as stated, named both Mr. and Mrs. Milburn as the insured, and plaintiff as loss payee as its interest may appear. Defendant now contends that plaintiff's rights under the conditional sale contract were derived from Milburn, and that inasmuch as the certificate of title was issued in Mrs. Milburn's name plaintiff has no interest which is covered by the policy. Defendant has overlooked the fact that under a conditional sale contract (as the instant instrument states) title to the property remains in the seller until the purchase price is paid. Auffenberg Lincoln-Mercury, Inc. v. Wallace, Mo.App., 318 S.W.2d 528. Plaintiff derived its interest, not from Milburn, but from East Side Motors, which assigned the conditional sale contract to it. There is no merit in the contention.

■ During the course of his cross-examination Walter L. Pruitt, Assistant Manager of World Investment, testified that plaintiff had paid nothing to East Side Motors at the time the conditional sale con-

tract was assigned. The arrangement made, Pruitt stated, was that plaintiff was to collect the monthly payments of $105 as they fell due, and to remit the proceeds, except for a collection fee, to East Side Motors. Its total fee, according to Pruitt, would have been $130. Defendant argues that plaintiff's only interest was its fee of $130, to which amount its right of recovery is limited. To the contrary, plaintiff's interest was that of holder of legal title to the conditional sale contract, by reason of the assignment to it. As such, it could sue thereon in its own name, though the title had passed to it only for collection. Guerney v. Moore, 131 Mo. 650, 32 S.W. 1132; Young v. Hudson, 99 Mo. 102, 12 S.W. 632. The loss under the conditional sale contract, of course, was the subject of the insurance. Furthermore, there was evidence that defendant had recognized plaintiff's interest by paying it a prior claim for damages to the car. Defendant at this late date is hardly in a position to question plaintiff's interest under the policy.

Defendant complains of the giving of plaintiff's Instruction No. 2 and the refusal of its Instruction A. These instructions defined a theft in accordance with the conflicting theories of the respective parties. What we have already said regarding the meaning of that word as employed in the policy disposes of defendant's contentions.

■ As its final point defendant contends that error was committed in giving plaintiff's verdict directing Instruction No. 1. It is claimed that the instruction failed to hypothesize sufficient facts for the jury to determine whether the automobile was stolen. In the instant case plaintiff's essential evidentiary facts—that Milburn left the car with Skelton for the purpose of finding a buyer, and that Skelton absconded with the car—were uncontroverted. The ultimate issue was whether the car had been stolen, and the instruction required the jury to find that fact before it could return a verdict for plaintiff. Where there is no divergent or conflict in the essential facts

it is sufficient to submit the ultimate fact for determination without specific hypothesization in the instruction. Hooper v. Conrad, 364 Mo. 176, 260 S.W.2d 496; Knight v. Richey, 363 Mo. 293, 250 S.W.2d 972. Defendant also complains of that portion of the instruction regarding notification of the loss, and argues that the means and method followed by Milburn was not in accord with that provided for in the contract. Defendant does not point to any means and method of notice specified in the policy, nor do we find such a provision. The only requirement is that the insured "give notice thereof (of a loss) as soon as practical to the company or any of its authorized agents." Plaintiff's undisputed evidence was that Milburn notified John E. Bell, the company's secretary, and a conceded authorized agent, by telephone as soon as he became aware of the theft of the car. The instruction required the jury to find that Milburn notified the defendant, through Bell, its agent, of the theft "as soon as practical." We think this was sufficient.

■ Defendant's third attack on Instruction No. 1 is that reference was made therein to plaintiff's "financial interest," whereas the policy of insurance required that plaintiff have an "insurable interest." Defendant does not point out where the word "insurable" appears before the word "interest" in the policy, nor have we been able to locate such a phrase. As previously stated, the words used in the loss payee provision is "Any loss hereunder is payable as interest may appear * * *." No contention is made that plaintiff did not have an insurable interest. Lastly, defendant complains that the instruction was deficient in that the date of the theft and of notification were not hypothesized, and that such dates were necessary to enable the jury to correctly assess the value of the automobile and the amount of the interest. Admittedly, the instruction is deficient as to such dates. But it is obvious that in returning its verdict the jury followed plaintiff's evidence as to the amount due on the condition-

al sale contract when Milburn discovered and notified defendant of the theft (which amount, $2162, was shown to have been less than the then value of the car), and defendant does not complain that the amount found as plaintiff's loss or the interest thereon was erroneous or excessive. Defendant does not point out, and we fail to see, how it was prejudiced by the omission. We are not authorized to reverse for harmless error, but only for that error committed by the trial court against the appellant materially affecting the merits of the action. Civil Rule 83.13(b), V.A.M.R.; Flanigan v. City of Springfield, Mo., 360 S.W.2d 700; Patison v. Campbell, Mo., 337 S.W.2d 72.

The judgment should be affirmed, and the Commissioner so recommends.

PER CURIAM:

The foregoing opinion of DOERNER, C., is adopted as the opinion of this court. The judgment is affirmed.

WOLFE, Acting P. J., ANDERSON, J., and R. KENNETH ELLIOTT, Special Judge, concur.