USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-1644 UNITED STATES AVIATION UNDERWRITERS, INC., Plaintiff, Appellee, v. FITCHBURG-LEOMINSTER, FLYING CLUB, INC., ET AL., Defendants, Appellees, and DEBORAH G. CROCKER, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Nathaniel Gorton, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Coffin and Campbell*, Senior Circuit Judges. _____________________ ____________________  ____________________ *Judge Campbell heard oral argument in this matter but did not participate in the drafting or the issuance of the panel's opinion. The remaining two panelists therefore issue this opinion pursuant to 28 U.S.C. 46(d). Traver Clinton Smith, Jr., with whom Michael P. Giunta and Margot __________________________ _________________ ______ A. Clower were on brief for appellant Crocker. _________ Richard M. Sharp with whom John Moustakas, Peter L. Puciloski and ________________ _______________ __________________ Keith D. Dunnigan were on brief for appellee U.S. Aviation ___________________ Underwriters, Inc. ____________________ December 16, 1994 ____________________ COFFIN, Senior Circuit Judge. Deborah Crocker sued the _____________________ Fitchburg-Leominster Flying Club, Inc. and her former husband (the insureds) in state court to recover $1,000,000 for injuries suffered when, on exiting a plane to seek help in parking it, she accidentally walked into its rotating propeller. The plane was owned by the Club and was being operated by her then husband. The liability insurer brought this diversity action in the United States District Court for the District of Massachusetts, seeking a declaration that, since the victim was a "passenger" within the meaning of the policy, even though she was outside the plane at the time of the accident, its policy restricted coverage to $100,000 for any judgment that might be recovered in the state court action. The district court granted summary judgment to the insurer. We affirm. Background  __________ The undisputed facts are that, on December 25, 1980, John Holden, his then wife Deborah Crocker, appellant herein, and his two children flew in a single engine Cessna from a Boston suburb to the Toronto International Airport. The aircraft had overhead wings and a propeller in the nose. The plane landed at dusk and Holden taxied it to an area near a building in which he saw someone through a lighted window. Unable to attract attention by flashing the plane's lights, Holden spoke with his wife and she left to get help from the person in the window. The engine still running, she exited, leaving the door open. She was then struck in the arm and head by the propeller. -3- The Club's policy was issued on an insurance form that lists seven different categories of coverage.2 The parties selected the first category, "combined liability for bodily injury and property damage," which insured against "claims for bodily injury, mental anguish and damage to someone else's property, resulting from the ownership, maintenance or use of the aircraft." This insurance covered up to $1,000,000 of liability, but was subject to a cap of $100,000 per passenger. The term "passenger" is defined as "anyone who enters your aircraft to ride in or operate it."3 The policy contains additional language relating to "passenger" in other options not selected. The second listed option covers bodily injury and property damage claims "except bodily injury and mental anguish claims by a passenger in your aircraft." The fourth option covers claims "for bodily injury and mental anguish to any passenger in your aircraft." The third option covers claims "for bodily injury and mental anguish to  ____________________ 2 The seven kinds of coverage are (1) "combined liability coverage for bodily injury and property damage," (2) "combined liability coverage for bodily injury (except to passengers) and property damage," (3) "liability coverage for bodily injury to anyone but passengers," (4) "liability coverage for bodily injury to passengers only," (5) "liability coverage for property damage," (6) "medical coverage," and (7) "aircraft physical damage coverage." 3 We, like appellee, do not consider it important that the combined liability coverage option selected does not itself contain this definition of passenger, which is given in several of the more narrow categories of coverage listed. Since the combined liability coverage is merely an amalgam of the risks covered by the narrower categories, by implication, the same definition of passenger applies. -4- anyone -- except a passenger -- who is injured." The phrase "in your aircraft," present in the former two options, is not included in the latter. Applicable Legal Standards __________________________ The issue of choice of law was apparently not addressed by the parties or the court below, but, since the policy was delivered to the Club in Massachusetts, which is also the domicile of insureds and claimant, we shall assume that the substantive law of that commonwealth applies. We suspect, however, that in general there is no relevant difference among jurisdictions. Our review of the propriety of summary judgment, in the absence of any factual dispute, is of course plenary. In interpreting the insurance policy at issue in this case, we apply the three fundamental principles articulated in Camp ____ Dresser & McKee, Inc. v. Home Ins. Co., 30 Mass. App. Ct. 318, ______________________ ______________ 323-24, 568 N.E.2d 631 (1991): we construe the policy "according to the fair and reasonable meaning of its words," interpret exclusionary clauses against the insurer, and resolve all ambiguities against the insurer. These tasks of contract interpretation, including the determination of ambiguity or its lack, are matters for the court. Boston Edison Co. v. F.E.R.C., _________________ ________ 856 F.2d 361, 365 (1st Cir. 1988) (referring to Massachusetts cases). When, as here, both parties earnestly contend that an insurance policy is clear, unambiguous, with a fair and reasonable meaning exactly opposite to that advanced by their -5- adversary, a court is tempted to say that, whatever a policy really means, it is at least ambiguous. But the discernment of two possible meanings for a word is not the end of a judicial assessment of ambiguity. As we have said: Lack of ambiguity is a relative status, not an absolute one. The parties need not choose phraseology which invariably excludes every possible interpretation other than the one they intend. [I]t [is] sufficient if the language employed is such that a reasonable person, reading the document as a whole and in realistic context, clearly points to a readily ascertainable meaning. Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1085 (1st ____________________ _____________ Cir. 1989). Analysis  ________ Appellant would have us quickly assume that, based on its dictionary definition, the word "passenger" under this policy means someone who has entered the aircraft to ride in or operate it and who is in the aircraft at the time of injury. If one is ___ outside, no matter how near or far, and regardless if the separation from the aircraft is recent or remote, transient or permanent, or involuntary or voluntary, one is no longer a "passenger." There is, indeed, literary precedent for such literal and narrow reading: Portia, a "rightful judge," refused to expand "a pound of flesh" to authorize the shedding of even a "jot of blood."4 But we lack the playwright's license. Literal exactitude is not the end of our quest. In Hazen Paper Co. v. U.S. Fidelity & _______________ _______________  ____________________ 4 William Shakespeare, The Merchant of Venice, Act IV, Scene 1, _______________________ lines 306-313. -6- Guar. Co., 407 Mass. 689, 693, 555 N.E.2d 576, 579 (1990), a _________ liability policy required the insurance company "to defend any suit seeking damages on account of . . . property damage." The insured had been accused of releasing hazardous substances into the environment. The threshold issue confronting the court was whether a letter from the Environmental Protection Agency naming the insured as a "potentially responsible person" [PRP] constituted a "suit." The court reasoned: Obviously, on the record no lawsuit has been brought. Literally, there is no suit. That fact alone has been sufficient to provide the answer for some courts. [Citations omitted.] It is, however, not sufficient to provide an answer for us. Id. After surveying the importance to the insured of the early ___ involvement of the insurer on receipt of a PRP letter, it concluded that "[t]he consequences of the receipt of the EPA letter were so substantially equivalent to the commencement of a lawsuit that a duty to defend arose immediately." Id. at 696, ___ 555 N.E.2d at 581. Similarly, our focus must be the broader one of discerning the parties' reasonable expectations from the context and the purposes sought to be served. As the Hazen Paper court put it, ___________ "[i]t is . . . appropriate, in construing an insurance policy, to consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." Id. at __ 700, 555 N.E.2d at 583. Accordingly, both to probe fair and reasonable meaning and to test for ambiguity, we examine the -7- actual language used, the context, the parties' reasonable expectations, and the relevant cases. The policy definition of passenger -- "anyone who enters your aircraft to ride in or operate it" -- does not carry us very far. Indeed, on its face, it does not seem to contemplate that the status of passenger ever terminates. We are confident the parties did not intend that, under this policy, once an individual entered the insureds' aircraft, she would remain, for all time, a passenger. The context in which the policy was written, however, is decidedly more illuminating. This is a two tier policy of liability insurance for a recreational flying group and its members. It protects the insureds for up to one hundred thousand dollars against claims by individual passengers and up to one million dollars against claims by non-passengers. As we contemplate what the parties must reasonably have intended and expected, we readily assume that they were aware of the full range of possible injuries that could befall members of the Club and their guests, including possible injury or death due to emergency landings or accidents involving maintenance work. We also assume they knew the risks of injuries to other aircraft and their owners, operators, and passengers, visitors to the airport, licensees, workmen, and all third parties. Finally, we assume that keeping down the cost of premiums was an important consideration in choosing to cover claims by passengers up to one hundred thousand dollars instead of up to one million dollars. -8- In this context, we cannot believe that the Club, its members, or the insurer could have intended that members and their guests could suddenly find themselves eligible for the million dollar coverage because they were forced to exit an aircraft by parachute and subsequently were injured or killed, or because they suffered some injury or anguish while making emergency repairs in flight, or while trying to remove wheel blocks or adjust a propeller before takeoff, or, as here, while temporarily leaving the plane to get assistance prior to securing the aircraft for the night. Conversely, if only passenger coverage had been purchased and the same situations occurred, we doubt very much that the parties would expect to find themselves deprived of coverage. We conclude that there is a reasonable expectation that "passenger" implies some necessary, unavoidable or frequently encountered situations occurring in connection with and in proximity to, but outside, an aircraft.5 What we described as our sense of the situation is amply borne out by the cases, some of them going back to the 'twenties. Similar language as that in the policy at issue has been construed to apply to persons who, during a journey by aircraft, had occasion to approach the plane and collided with the  ____________________ 5 It is true that the phrase "in your aircraft" is found in two of the (not selected) coverage descriptions. See supra at 3-4. ___ _____ But it seems likely to have been inserted to emphasize that the limitation does not apply to passengers in another aircraft who _______ have been injured. And, as we have noted, the clause is not to be found in a companion clause offering coverage for bodily injury to anyone but passengers. There is no rational explanation for this varying treatment and we therefore assign no other significance to the phrase. -9- propeller. In Pittman v. Lamar Life Ins. Co., 17 F.2d 370 (5th _______ ____________________ Cir. 1927), a co-owner of an aircraft, which stopped near a hangar with its engine running, got out, walked toward his automobile, and was struck by the propeller and killed. The life insurance policy contained a provision that limited benefits in the event that death was caused by "participating in aeronautical activity." The court held that "aeronautical activities of one who takes [an airplane] trip . . . includes his presence or movements in or near to the machine incidental to beginning or concluding the trip" and that the activity in this case was so "connected with and incidental to the airplane trip." Id. at __ 371. The narrow term, "riding in" an aircraft, was held to include one who jumped or was thrown from it in Willingham v. __________ Life & Cas. Ins. Co. of Tenn., 216 F.2d 226, 228 (5th Cir. 1954). _____________________________ The court said, "[w]e think that the phrase `riding in' in the context here employed is unambiguous and clearly includes falling or being thrown from the airplane because of difficulties in flight." A similarly narrow definition contained in a policy exclusion (injury sustained "while in or on any vehicle . . . for aerial navigation") was held to apply to a death by drowning after a forced landing on water in Wendorff v. Missouri State ________ _______________ Life Ins. Co., 318 Mo. 363, 366-67, 1 S.W.2d 99, 100 (1927). ______________ Almost forty years later, in a case involving a crash during takeoff near a lake, the Ninth Circuit similarly ruled, under -10- policy language covering death from "operating or serving as a member of a crew of an aircraft." Rauch v. Underwriters at _____ _______________ Lloyd's of London, 320 F.2d 525, 526 (9th Cir. 1963). The court _________________ held that the "aeronautical activities of decedent Rauch did not end with the actual flight . . . but included his voluntary or involuntary presence and movements in the lake water near the plane following its crash." Id. at 531. In short, "operating" ___ included something following actual operation of the plane. Other cases recognizing risks of drowning as familiar risks of aviation are Green v. Mutual Benefit Life Ins. Co., 144 F.2d 55 _____ _____________________________ (1st Cir. 1944), and Neel v. Mutual Life Ins. Co., 131 F.2d 159 ____ ____________________ (2d Cir. 1942). In the instant case, the activity in which appellant was engaged was not reembarking or parachuting or struggling in the water after a crash but, more like that in Pittman, even more _______ tied to trying to bring about the successful end of the flight, to obtain assistance before securing the aircraft. The concept of coverage for one who was injured while assisting the transportation enterprise was articulated in Emerson v. Carolina _______ ________ Cas. Ins. Co., 206 F.2d 13 (8th Cir. 1953), where a passenger in ______________ a truck had been asked by the driver to help uncouple a trailer and was then injured. The court denied him the status of guest passenger because it was not reasonable that a guest passenger would be instructed to do something that was normally done by the operator at the end of a journey. But it said: If what Goodman was doing at the time of his injury was a reasonable incident to his relationship of the kind of -11- passenger he initially was, he will continue to be a passenger although not physically in or upon the vehicle. Ruel v. Langelier, 299 Mass. 240, 12 N.E.2d 735. _________________ Id. at 18.  ___ Emerson's citation to Ruel v. Langelier leads us to a number _________ ____ _________ of Massachusetts cases dealing with a related question: when does the status of a guest passenger in another's automobile cease for purposes of determining the driver's duty of care in tort suits? In Ruel, the defendant offered plaintiff a ride home, but, ____ because his car was stuck in the snow, he first elicited her help in pushing the car free. She was injured in the attempt. The court found that, though she was outside the car at the time of the injury, she was still his guest. Ruel v. Langelier, 299 ____ _________ Mass. at 242. In Ethier v. Audette, 307 Mass. 111, 29 N.E.2d 707 (1940), ______ _______ the driver of the vehicle gave plaintiff a ride home. The plaintiff wanted to stop to buy sandwiches for both to eat at her home. They stopped at a restaurant; plaintiff walked toward it, then back to the car to persuade the driver to join her; the motor running, the car slipped into reverse and injured plaintiff, whose foot was on the running board. The court held that "[t]he stop, which was for a common purpose, was an incidental part of the transportation, and a part of the undertaking." Id. at 113, 29 N.E.2d at 708. Similarly, in ___ Bragdon v. Dinsmore, 312 Mass. 628, 630, 45 N.E.2d 833 (1942), _______ ________ helping a driver park a vehicle was held to be "necessarily -12- incidental to the accomplishment of the gratuitous undertaking, in order to carry out its prearranged purpose." Finally, in Sutherland v. Scardino, 334 Mass. 178, 134 __________ ________ N.E.2d 444 (1956), plaintiff helped the driver change a flat tire. He was held still to be an "occupant" of the vehicle. The fact that plaintiff was not in defendant's vehicle when injured was not material. "Both were in its immediate vicinity engaged in activities designed to promote a resumption of its use." Id. ___ at 182, 134 N.E.2d at 446. In sum, we feel that the Massachusetts Supreme Judicial Court would apply similar reasoning in determining whether appellant in the case at bar had lost her status as passenger because she had left the aircraft momentarily to seek help and was injured almost immediately. We have searched for contraindications of these authorities, ancient as some may be. Appellant has not favored us with any cases where, in like situations, the narrowest of definitions of "passenger" or similar words has been applied to exclude necessary or predictable events so closely tied to the original status. She has argued mainly against relying on precedents construing cases decided under the Warsaw Convention and common carrier cases where pro-passenger public policy may have played a major role. We have not relied on any. As for appellant's urging that we construe exclusionary clauses against the insurer, we observe that this policy form contains certain options covering passengers and certain options -13- covering non-passengers. If the insureds had chosen only the option covering passengers, it could not be argued that the policy provision that was the source of protection was an exclusion. The same reasoning applies to the policy actually chosen, which combines extensive coverage for non-passengers with more limited coverage for passengers. The coverage for passengers is not subject to the special rules of construction for policy exclusions. We therefore, after this considerable journey, conclude that the policy language at issue is not, in law, ambiguous, and that its fair and reasonable purport is to include appellant as a "passenger" at the time of her unfortunate accident. The judgment of the district court is AFFIRMED. -14-