**Richard MOCK, d/b/a Richard Mock Motors,
Plaintiff-Appellant,**

v.

**MISSOURI UNION INSURANCE COM-
PANY, Defendant-Respondent.**

**No. 22913.**

Kansas City Court of Appeals.

Missouri.

Oct. 5, 1959.

Carl H. Willbrand, and Solbert M. Wasserstrom, Kansas City, for appellant.

C. William Garver and Clark S. Ullom, Kansas City, for respondent.

CAVE, Presiding Judge.

This is a suit on an automobile dealer's open theft insurance policy. Trial to a jury resulted in a verdict and judgment for defendant. Plaintiff appealed.

The petition alleges the issuance of the policy insuring the plaintiff against the "theft" of a certain automobile; that said automobile was stolen at Los Angeles, California; that defendant had vexatiously refused to pay, and prayed judgment for the value of the car and penalty for vexatious delay and attorneys' fees. The answer consisted of a general denial, together with affirmative defenses alleging that plaintiff's loss came within certain exclusion clauses, quoted infra, which relieved defendant of liability for the loss.

The pertinent insuring clause of the master policy provides: "Coverage G—Theft (Broad Form). To pay for the loss of or damage to the automobile, hereafter called loss, caused by theft, larceny, robbery or pilferage". There was attached to the policy an "endorsement". It incorporated the exclusions pleaded by defendant as affirmative defenses. The first exclusion provides: "(7) This policy does not apply: * * * (d) Under any Coverage—to loss resulting from * * * Embezzlement, Conversion, Secretion, Theft, Larceny, Rob-

bery, or Pilferage *committed by any person* including any Employee, *entrusted by the Insured with either custody or possession of the automobile."* (Italics supplied.) Thus the exclusion clause relieves defendant of liability for "theft" or any of the other enumerated acts, *only* if such act was committed by a person *entrusted*, by the insured, with *custody* or *possession* of the automobile.

Plaintiff first contends there is no substantial evidence that the automobile was entrusted to the person who made away with it, and the court erred in submitting that issue in defendant's Instruction 3. If this contention is well founded, other criticisms of the instruction need not be discussed.

A general statement of the facts will first be made.

Plaintiff was engaged in the business of buying and selling automobiles. His principal business was acquiring automobiles in Kansas City, Missouri, and selling them to other dealers in the State of California. These automobiles were usually delivered by individuals who would agree to drive them to California in consideration of their own free transportation. In July, 1956, plaintiff agreed orally to sell the automobile in question to a dealer in San Francisco by the name of Goggins. The sale was not to be consummated until delivery of the automobile and the title thereto. On August 2d plaintiff entered into an arrangement with Miss Reba Woodmansee whereby she was to drive the car to California and deliver the same to Goggins. Plaintiff knew that Miss Woodmansee intended to permit other parties to ride with her, but he did not know them. Some of the parties changed their minds, and she was accompanied only by a Mr. Sunderland. They agreed to exchange driving every three hours, and drove directly through to Lakewood, California, without stopping except for food and car service. On arrival they stopped at the home of Miss Woodmansee's sister, and remained about two and one-half

hours, visiting and having coffee. Miss Woodmansee intended to return to her sister's home from San Francisco, so she and her sister and Sunderland went to the car to get her luggage. Sunderland unlocked the trunk and removed the luggage and Miss Woodmansee and her sister carried it into the house, where she remained a few minutes, and when she returned, Sunderland and the car were gone. Nothing was heard from him, or the car located, until about 10 months later. It was delivered to plaintiff in damaged condition.

It is undisputed that Sunderland unlawfully made away with the automobile. The question is, Does the evidence, presently to be considered, bring the unlawful act within exclusion 7(d)? If so, it would make no difference whether he committed theft, larceny, embezzlement, or conversion, because all such offenses are excluded under one condition: that is, that the insured *entrusted the custody or possession of the automobile* to Sunderland. For the purpose of this opinion, we will assume, without deciding, that Miss Woodmansee was the agent of the plaintiff, and could entrust the car to Sunderland. But see White v. Gifis, D.C., 172 F.Supp. 296, wherein the court considered facts almost identical with those in this case and held that the driver (Woodmansee) was an independent contractor and not an employee of the owner.

In Pacific Indemnity Co. v. Harrison, Tex.Civ.App., 277 S.W.2d 256, the court was construing the identical exclusion as in the instant case and said (261), "The word *entrust* has been defined by both lay and legal authorities in substance to mean to commit something to another with a certain confidence regarding his care, use or disposal of it." In 22A, Words and Phrases, page 135, are cited cases defining "entrust" and "intrust" as being synonymous and that each means more than naked possession or custody of, or access to, the property appropriated. See also 48 C.J.S. page 754, and Webster's New International Dictionary, Second Edition.

With this understanding of the meaning of "entrust", we review additional evidence to determine whether it is sufficient to submit to the jury the issue of *entrustment* of the automobile to Sunderland. Defendant had the burden of proof of this affirmative defense.

The only evidence of entrustment is the testimony of Miss Woodmansee. She testified that when they reached her sister's home in California, "We went in the house for some coffee, and it was about 11:30 when we decided we had better get back and go on to Frisco, and we went out to the driveway where the car was parked and took the bags out of the car, including Mr. Sunderland's bags, also. We set them down on the drive and my sister and I carried my bags in the house. I had some new clothes in the bag, and I hung them up, and when we came back the car was gone. Q. Did you give Mr. Sunderland authority to take the car away? A. No. * * * I did not sir. Q. You didn't let him have it? A. No. * * *".

On cross-examination the following appears:

"Q. I will ask you whether or not you were talking to him about having the car serviced and Kenny (Sunderland) said, 'I will do it', and that was a long time before he left? A. We were talking at the table when we went for coffee, before we started to Frisco we would have to service the car. * * * We talked about the car being serviced before we went out—that we would have to gas up the car before we went on to Frisco. * * * My sister, myself and Kenny went out to the driveway where the car was parked, and the lock on the trunk was evidently stuck and we had trouble getting the trunk lid up. * * * When we got the thing open, we took the bags out.

"Q. What did Kenneth Sunderland do with his luggage? A. He set it down on the drive beside the car * * *.

"Q. Miss Woodmansee, state whether or not he took the car to be serviced. A. No, not as far as I know.

"Q. But you saw him pick up the keys? A. Yes.

"Q. That was after you talked about having the car serviced? A. About an hour and a half later, yes. * * *"

Re-direct examination:

"Q. (By the court) Did you see Kenny Sunderland drive the car away there? A. No, sir, I did not. * * *

"Q. (By counsel) What was that conversation at the coffee table? A. We just mentioned that the car would have to have gas and oil before we started to Frisco.

"Q. That was the conversation between you and Kenny Sunderland? A. And my sister. We were talking about how much we would have to have the car serviced and about the gas. There was no discussion. It was just a statement.

"Q. (By the court) Did you have any understanding as the result of that conversation as to who would service the car? A. No, sir.

"Q. (By counsel) Now, in regard to the matter of the keys, when did Mr. Sunderland first get the keys? A. When we got up to go out of the house to get the bags out of the car.

"Q. He took the keys? A. Yes, sir.

"Q. What did he do with the keys? A. He took the keys out to the automobile to open the trunk. He kept the keys. After we got the trunk open and the bags out he still had the keys. * *

"Q. Did you give him any authority to drive the car anywhere or to take the keys and hold them? A. No, sir."

Re-cross examination:

"Q. Now, didn't he tell you he would take the car to have it serviced? A. No, sir. * * *

"Q. Now, Miss Woodmansee, while you were having coffee, Mr. Sunderland suggested that he take this 1956 Dodge to the service station, didn't he? A. No, not actually. We were talking about how long it would take us to take the car from Lakewood to Frisco. We were figuring the time. We would have to have the car serviced and the oil changed and the tires. We hadn't done it for quite a distance. He said he knew the gas tank was about empty and we figured the time it would take us so I could catch a plane back from Frisco.

"Q. He offered to take it and have it gassed and ready to go, didn't he? A. Not actually, no.

"Q. Didn't he say he would? A. No, I don't think so."

The defendant then read certain questions and answers from the deposition of Miss Woodmansee, in reference to Sunderland taking the car to be serviced:

"Q. He said he would, didn't he? A. Yes, in the matter of conversation. * * *

"Q. You wanted the car made ready to go when you were ready to travel again? A. We were talking about having the car serviced and at the time Kenny said, 'I will take it', but that was a long time before * * *.

"Q. So you let him take it to a service station? A. No, I didn't, sir. * *

"Q. You let him take the car? A. I didn't let him take the car. I never told him to take the car.

"Q. Did he take the keys from you? A. He picked the keys off the table when we went to get the luggage out of the car".

This is all the evidence relative to the *entrustment* of the custody or possession of the automobile to Sunderland.

█ Defendant's Instruction 3 purports to submit that issue to the jury. We are of the opinion that the evidence is insufficient to authorize such submission.

Miss Woodmansee stated several times that she did not direct Sunderland to take the car any place or give her consent for him to do so. In answer to a question by the court she said there was no understanding as to who would service the car. When she went to get her luggage, Sunderland did the natural thing to assist a woman companion, by picking up the car keys from the table and going along to open the trunk. There was no reason for her to protest his doing so. The fact that he retained the keys while Miss Woodmansee went into the house to hang up her clothes is of no significance, because they were leaving immediately for San Francisco.

In the briefs, counsel discuss at length the legal definition of the words "theft", "larceny", "embezzlement", and "conversion". Because of the conclusion we have just reached as to the sufficiency of the evidence, it is unnecessary to elaborate on such distinctions, because, if Sunderland was not entrusted with the custody or possession of the automobile (as we hold), then his taking it would come within the meaning of "theft" or "larceny", as defined by all the courts. For an exhaustive discussion of this subject, we refer those interested to 48 A.L.R.2d page 12 et seq.

Defendant cites Eiswirth Const. & Equipment Co. v. Glenn Falls Ins. Co., 241 Mo. App. 713, 240 S.W.2d 973, and Hartford Fire Ins. Co. v. Tubb, 5 Cir., 242 F.2d 921. The facts in these cases clearly make them inapplicable.

The second exclusion pleaded by the defendant is: "The Policy covers automobiles consigned to or owned by the Insured and held for sale or used in the Insured's business as an automobile dealer, including repair service or as demonstrators, but *excludes* automobiles sold by the Insured under bailment lease, conditional sale, mortgage or other type of encumbrance. Automobiles consigned to or owned by the Insured which are subject to a trust agreement, bailment lease, conditional sale, mortgage or other type of encumbrance, are not covered hereunder unless specifically so indicated below."

█ Defendant did not offer an instruction submitting an issue under this exclusion and it will be considered abandoned. Defendant did offer and the court gave Instruction 5, defining "bailment", but it did not direct a verdict and did not submit any facts which would constitute bailment or any of the other excluded acts, such as conditional sale, etc. It served no useful purpose.

The judgment is reversed and the cause remanded.

All concur.