William L. THOMAS,
Plaintiff-Respondent,

v.

BANK OF SPRINGFIELD, Defendant-
Third Party Plaintiff-Appellant,

v.

Tim NEWTON, Third-Party Defendant.

No. 12065.

Missouri Court of Appeals,
Southern District,
Division One.

March 5, 1982.

Motion for Rehearing or to Transfer to
Supreme Court Denied March 23, 1982.

Bruce McCurry, Dickey, Allemann & McCurry, Springfield, for plaintiff-respondent.

Harold F. Glass, Schroff, Glass & Newberry, P. C., Springfield, for defendant-third party plaintiff-appellant.

TITUS, Judge.

Plaintiff sued defendant bank for $3,724. This represented the amount of a check plaintiff had written on his account with the defendant bank and which the bank paid after it had received plaintiff's verbal stop payment order. The bank answered and filed its third party petition, apparently per § 400.4–407,[1] against the payee of the check to recover any damages which might be assessed against the bank on plaintiff's petition. A Greene County jury returned verdicts for plaintiff on his petition against the defendant bank in the sum of $3,724 and for the bank on its third-party petition against the check payee in the sum of $3,724. The court entered judgment upon the verdicts, after determining the interest to be added to the money awarded by the jury, and only defendant bank appealed.

Near 12:00 A.M. January 9, 1978, plaintiff gave Tim Newton his $3,724 check drawn on plaintiff's account with the Bank of Springfield. The check was dated January 9, 1978. Plaintiff did not write the name of the payee on the check but, apparently with his assent, this was supplied via a rubber stamp imprint reading "Newton Super Market," the name of the business Newton operated in Ash Grove. After delivering the check to Newton, plaintiff had misgivings concerning his action and determined to stop payment thereon. At either 7 A.M. or 8 A.M. January 9, 1978, plaintiff telephoned the Bank of Springfield, talked with a female employee and orally ordered that payment be stopped on the check. Plaintiff recounted the bank employee

---

1. References to statutes and rules are to RSMo 1978 and Missouri Rules of Court.

asked that plaintiff "stop in and sign a card" to that effect when he "was in the vicinity" of the bank. On the same day, i.e., January 9, 1978, the bank wrote a notice to plaintiff that his bank account had been debited in the sum of $3.00 for "Stop pay charges."

Soon after the bank was opened to the public at 9 A.M., January 9, 1978, Newton appeared, presented plaintiff's check and was given a $3,724 cashier's check therefor. Near 10:30 A.M. on either January 9 or 10, 1978, he could not remember which, plaintiff went to the bank as requested to sign a written stop payment card. This became unnecessary when it was discovered the bank had already cashed the check and paid the proceeds to Newton.

### Plaintiff's Evidence

Plaintiff testified he had once been in the "heating and air conditioning business" but was not so engaged on Sunday, January 8, 1978, when he received a telephone call from Tim Newton (third party defendant) asking him to service the refrigeration units at Newton Super Market in Ash Grove. Plaintiff and James Young drove to the market Sunday "evening." Shortly after their arrival, Newton and Young departed leaving plaintiff alone at the store. After being at the market some 45 minutes, plaintiff recounted he went to the residence of Gilbert Binkley near Bois D'Arc to change a blower assembly on a heating unit. This task consumed two hours and, plaintiff said, was completed at 10 or 10:30 p. m. Upon departing the Binkley home, plaintiff testified he drove to the house of Aaron Wilkerson four miles west of Ash Grove. Finding no one home, plaintiff drove to Tim Newton's residence in Ash Grove arriving "around Sunday at midnight." Plaintiff acknowledged he had not charged for services or parts in connection with work performed at the market or the Binkley home because their units were still "under warranty."

Tim Newton's residence consisted of a house and detached garage, the latter being divided into a parking area and a "game room." Plaintiff recalled upon arrival at the Newton garage he was met by Newton at the garage door and, consequently, did not go into the game room which he saw was occupied by James Young and two men. Newton, according to plaintiff, asked for a $3,724 loan "to make a transaction," with assurances he would repay the loan "the following day." Plaintiff acceded by giving Newton the previously described check. On the check presented by plaintiff at trial was written "Per loan" in the space intended to indicate its purpose. Plaintiff said this was an abbreviation for "personal loan." When asked why "Per loan" was written in ink of a color differing from the rest of the check, plaintiff said that "possibly my pen give out" and he used another "or it come to me that that should be on the check and I put it on there later." However, the photocopy and microfilm of the check made by the bank did not have "Per loan" written on it.

Plaintiff acknowledged signing the bank's "Depositor's Contract and Signature Card" but denied having ever read the "Depositor's Contract" appearing in diminutive print on the back of the card. Inter alia, the contract provided that no stop payment order was valid unless made in writing and that the depositor agreed to hold the bank harmless on account of payment made contrary to the order if it occurred through "inadvertence, accident or oversight." Plaintiff was adamant in his denials that the check had been given to Newton in payment of plaintiff's gambling losses on the night of January 8, 1978, and that although Newton had never repaid the "loan," he had not sued Newton to recover the "loan" and did not consider Newton liable "for the goof-ups that this bank has made."

A vice-president of the bank, who was also the bank's cashier and custodian of its records, appeared as a witness for plaintiff. He verified the bank's records showed a bank employee at the main branch facility where plaintiff's check was cashed, received at 8 a. m. January 9, 1978, a stop payment order on the check in question and that plaintiff's account was charged $3 for the

service. The witness acknowledged that bank employees are not instructed to refuse telephone stop payment orders and, in fact, it's "done every day." When asked if "there are many occasions when checks are stopped pursuant to oral ... stop payment orders," the vice-president answered, "Certainly." The witness' explanation as to why the check had been cashed after the bank had received the stop payment order, was that the stop payment information did not get on the bank's microfiche records for 24 hours and would not be accessible to bank tellers when checking the microfiche viewer until that time.

### Defendant's Evidence

Gilbert and Elda Binkley, husband and wife, lived two miles north of Bois D'Arc and it was their home at which plaintiff testified he stayed two hours while changing a blower assembly on their heating unit on January 8, 1978. Mr. and Mrs. Binkley testified plaintiff had installed a heating and air conditioning system in their newly constructed house in 1972, but denied plaintiff had ever been in their home after 1972, especially in January 1978.

### Third Party Defendant's Evidence

Third party defendant, Tim Newton, testified plaintiff had not been in his store on Sunday, January 8, 1978, to repair refrigeration units or otherwise, but rather was at his Ash Grove garage in the game room from "somewhere between 7:00 or 8:00 o'clock Sunday evening" until "around midnight" playing poker. According to Newton, when the game broke up, plaintiff owed Newton and another gambler together $3,724 and plaintiff paid his gambling debt in that amount by delivering the check in question. Newton confirmed he cashed the check at defendant's bank "shortly after 9:00" a. m. on January 9, 1978, and received defendant's cashier's check in like amount. Newton flatly denied the check had been given him by plaintiff as any sort of a loan.

### Plaintiff's Rebuttal Evidence

Plaintiff's lone rebuttal witness, James Young, testified he and plaintiff went to Newton Super Market on January 8, 1978. After plaintiff conferred briefly with Newton, Young and Newton went to the latter's house leaving plaintiff at the store. Young said plaintiff did not appear at Newton's house until midnight. Any further intended testimony by Young was halted by the court, as defendant and Newton objected, because plaintiff, in answering interrogatories, had not given his opponents Young's complete address although such was shown to have been known by plaintiff.

Three of the bank's points relied on herein are predicated on assertions "the trial court erred in failing to direct a verdict for defendant" for the following reasons: (1) "because plaintiff's testimony that third-party defendant Newton owed plaintiff no money amounted to a judicial admission that plaintiff had not suffered any damage and, thus, plaintiff did not make a submissible case;" (2) "because the evidence clearly showed that the check was delivered by plaintiff to third-party defendant for payment of a gambling debt and, therefore, plaintiff's only basis for recovery would have been under V.A.M.S. § 434.030 and § 434.090 and there was no compliance with the statutes;" and (3) "because (A) the uncontradicted evidence showed that no written stop-payment order was delivered to the defendant as required by the Depositor's Contract and Signature Card; and (B) The evidence did not support a finding that defendant failed to exercise ordinary care in paying the check."

■ Point (1), supra, has this background. Upon cross-examination, plaintiff acknowledged his loan to Newton had not been repaid and the reason he had not sued Newton on the loan was that "the way I feel" Newton did not owe him any money because of the "goof-ups that this bank has made.... That's why I feel the way I feel." Accepting for the moment plaintiff's entire testimony, he possessed two separate and distinct causes of action, i.e., one against Newton on the loan and the other

against the Bank of Springfield on account of its dereliction in not effectively stopping payment on the check in accordance with plaintiff's stop payment order. We are cited no authority and have found none holding that where a party is possessed of two different causes of action, each against two different persons on different theories of liability, he is obliged to file on both actions, either together or separately, to avoid forfeiting the single cause of action he seeks to enforce. People often become possessed of a cause of action which they, for multiple reasons personal to themselves, determine to forsake. Such abandonments do not constitute elections or otherwise serve to estop or bar them from pursuing other, or even similar or related, causes of actions of which they may be possessed. But all this aside, plaintiff's testimony that "the way I feel" Newton owed him no money is by no means an admission that he suffered no damages on account of the bank's alleged negligence in failing to effectively stop payment on the check as plaintiff admittedly ordered.

∎ As to (2), supra, defendant's assertion "that the evidence clearly showed" plaintiff's check was given Newton in payment of a gambling debt is patently erroneous as the evidence "clearly showed" no such thing. The foregoing recitation of the trial testimony evidences that plaintiff asseverated the check was given as a personal loan to Newton, whereas Newton contended it was given in payment of gambling losses. As fact-finders, the jury in the first instance was the sole judge of the credibility of the witnesses and the weight to be given their testimony. In addition, the jury had leave to believe or disbelieve all, part or none of the testimony of any witness. *Gibson v. Reliable Chevrolet, Inc.,* 608 S.W.2d 471, 473[1] (Mo.App.1980); *Robinson v. St. John's Medical Center, Joplin,* 508 S.W.2d 7, 11[3] (Mo.App.1974). Moreover, the issue of whether the check represented a loan or payment of a gambling debt was strictly between plaintiff and Newton. We do not comprehend how it affected plaintiff's separate and distinct cause of action against the bank for failing to stop payment on the check in compliance with plaintiff's stop payment order. Defendant bank's point is denied.

As to (3), supra, the effect of this point relied on, albeit written in utter disregard of the mandatory requirements of Rule 84.-04(d), is the bank's claim that plaintiff failed to make a submissible case because, first, the bank was not obliged to honor an oral stop payment order in view of the provisions of the Depositor's Contract that no such order "shall be valid unless in writing" and, second, the evidence did not support a finding that the bank failed to exercise ordinary care in paying the check.

∎ Concerning the requirement of the depositor's contract that stop payment orders must be written, it is interesting that § 400.4–403 specifies "(1) A customer may by order to his bank stop payment of any item payable for his account [if received by the bank] at such time and in such manner as to afford the bank a reasonable opportunity to act on it . . . . (2) An oral order is binding upon the bank only for fourteen calendar days . . . ." This statute, it seems, clearly contemplates a right in the customer to orally order stop payment of a check provided the order is seasonably given and received. Here the bank does not argue the oral stop order made by plaintiff was not made in time for it to have effectively acted. Nonetheless, we are perplexed with whether § 400.4–103, i.e., "The effect of the provisions of this article may be varied by agreement," serves to emasculate the right conferred by § 400.4–403 when there is a depositor's contract recognizing only written stop payment orders. Fortunately, we need not resolve the problem because in avoidance of the bank's claim, in his reply to the bank's answer, plaintiff affirmatively pleaded, inter alia, that the requirement for a written stop payment order had been waived and the bank, therefore, was estopped to deny the validity of the oral order. Rule 55.08. Defendant bank's assertions regarding the foregoing ignores the testimony of its cashier and vice-president that bank employees are not instructed to

abide by the written-only stop payment order proviso in the depositor's contract, but rather the bank, on "many occasions" and as a matter of course, accepts verbal stop payment orders and sees that they are effected. Such an acknowledgment surely evidenced to the trier of the facts a consistent and conscious waiver or abandonment of the bank's requirement that stop payment orders would be honored only if made in writing. *Ashelford v. Baltrusaitis,* 600 S.W.2d 581, 587[3] (Mo.App.1980). Moreover, if consideration is needed for the waiver (which it is not), the $3 charge to plaintiff's account by the bank for "Stop payment charges," satisfies the requirement.

Under § 400.4–103, variations are permitted to "this article" if agreed to by the parties. However, so the statute states, the agreement cannot disclaim a bank's responsibility for its "failure to exercise ordinary care" and any such contract may not be "manifestly unreasonable." The depositor's contract herein would exonerate the bank from liability for paying a check despite a stop payment order if the payment occurred through "inadvertence, accident or oversight." This provision, it seems, called for absolute pardon of any and all conceivable sins, foibles and acts of omission or commission. Perhaps the bank considered its self-imposed blanket immunity to be "manifestly unreasonable," which may explain why, in its point relied on, it resorted to the language of § 400.4–103 by declaring the evidence did not support a finding the bank had "failed to exercise ordinary care" in cashing the check after the stop payment order was received. But such speculation is neither necessary nor warranted. The only instruction offered by the bank to excuse it from liability was predicated solely on plaintiff's signing the depositor's contract whereby he purportedly agreed that "no stop payment order ... shall be valid unless in writing and delivered to the office of the bank." No instruction was offered by the bank concerning its failure vel non to exercise ordinary care. When this occurred the issue of ordinary care was abandoned and will not be considered on appeal. *Mock*

*v. Missouri Union Insurance Company,* 328 S.W.2d 61, 65[3] (Mo.App.1959); cf. *Pickett v. Stockard,* 605 S.W.2d 196, 198[5] (Mo. App.1980).

Defendant bank additionally contends the trial court erred in overruling objections to certain portions of plaintiff's final argument. Third party defendant Newton objected to the argument in question but no objection thereto was made by the bank. Defendant bank's claim is foreclosed from our consideration because of its failure to object to the alleged erroneous argument. *Mueller v. Storbakken,* 583 S.W.2d 179, 186[6] (Mo. banc 1979). Where several parties to an action are entitled to object, an objection made by only one will not inure to the benefit of the party or parties who do not join in the objection. Defendant bank is not entitled to reversal on account of any errors of which it did not complain at trial merely because there was a third party defendant in the case who did complain. *State ex rel. St. Louis Bridge & Terminal Rys. Co. v. Haid,* 325 Mo. 532, 536, 29 S.W.2d 714, 716[3] (1930); 4 C.J.S. Appeal and Error, § 251, p. 769.

Another of defendant bank's points relied on: "The court erred in giving Instruction No. 7 submitted by plaintiff because said instruction failed to require a finding that the defendant bank failed to exercise ordinary care and, further, said instruction was not supported by the evidence." Regarding this point, it suffices to note that in defendant's motion for a new trial its only complaint of giving that instruction was that there was "no competent and substantial evidence that Plaintiff 'stopped payment on the check.'" As the after-trial motion contained no complaint relative to the instruction as voiced for the first time here in its point relied on, supra, the complaint was not preserved for appellate review. *Epperson v. Nolan,* 452 S.W.2d 263, 268[12] (Mo.App.1970).

What has just been said regarding defendant's point relied on as it relates to Instruction No. 7, applies equally to his complaints of Instruction No. 9. On appeal

the reasons advanced as to why defendant considered it error for the court to have given Instruction No. 9, have no relationship to the reasons stated in its motion for a new trial. Consequently, the point is not for consideration on appeal. *Epperson*, supra.

Defendant's final point relied on: "The trial court erred in failing to strike the testimony of James Young and in failing to instruct the jury to disregard his testimony because plaintiff had failed to disclose the address of James Young even though he was asked to do so in interrogatories and in his deposition." The point has the following background. James Young, as previously observed, accompanied plaintiff to Ash Grove on January 8, 1978, and participated in the poker game played in the game room of third party defendant Tim Newton's garage. In answering interrogatories, plaintiff gave Young's address as "Springfield, Missouri" and was evasive in his answers to similar questions when his deposition was taken. The trial herein consumed the better part of two court days. Sometime during the first day of trial defendant's counsel and counsel for third party defendant became aware that Young was in the courthouse outside the courtroom. The "rule on witnesses" had been ordered. Defendant's attorney had access to Young's telephone number—and had, without success, undertaken to call him before trial settings. During the second day of trial, after defendant and third party defendant had rested, plaintiff called Young as a rebuttal witness. Without objection, Young was sworn and testified that on January 8, 1978, he went with plaintiff to Ash Grove, left plaintiff at the Newton Super Market and accompanied Newton to the latter's house. The witness said he remained on Newton's premises and that plaintiff did not arrive there until "around midnight." At this point both counsel for defendant and third party defendant approached the bench. Third party defendant objected "to any further testimony by Mr. James Young." The jury was excused from the courtroom and extensive testimony by plaintiff and all the lawyers was heard. At

the conclusion of the proceedings, the court ruled that any further testimony by Young "should be excluded." It was then that defendant's attorney moved to strike all of Young's testimony and to have the court "instruct the jury that they shall disregard it entirely." The request was denied.

■ Without doubt, a trial court has authority to impose sanctions against a party for making untruthful and evasive answers to questions propounded via depositions or interrogatories. Rule 61.01; *Hilmer v. Hezel*, 492 S.W.2d 395, 397 (Mo.App. 1973). However, the existence vel non of prejudice to a party and what sanctions shall be imposed upon him who untruthfully or evasively answers deposition or interrogatory questions, is originally for determination by the trial court in the exercise of its sound discretion. *Missouri State Park Board v. McDaniel*, 473 S.W.2d 774, 776[1] (Mo.App.1971), 51 A.L.R.3d 1040. In the exercise of such discretion, the trial court may admit or reject such evidence, or otherwise determine and impose appropriate sanctions for violation of discovery rules. *Aulgur v. Zylich*, 390 S.W.2d 553, 556[2, 3] (Mo.App.1965). That each case must rest upon and be ruled by its own particular facts is especially applicable to the problem as to whether the court nisi has abused its discretion in imposing the sanctions made. *State ex rel. Norfolk & Western Ry. Co. v. Dowd*, 448 S.W.2d 1, 4[4] (Mo. banc 1969); *Peoples-Home Life Ins. Co. v. Haake*, 604 S.W.2d 1, 5 (Mo.App.1980). Under the facts in this case, defendant bank was long aware ere trial that Young was a potential witness. Counsel for the defendant admitted knowledge of Young's telephone number before trial and to having observed Young in the courthouse hallway during the trial. This, coupled with counsel's knowledge of plaintiff's testimony, and other circumstance, would seemingly make it evident to defendant's lawyer that Young's attendance in the courthouse during the trial was more than a happenstance. Nevertheless, defendant's objections to Young's testimony were not declared until he had been called, sworn and answered some twenty questions

propounded by plaintiff's attorney. Under such conditions we may not declare that the sanctions imposed or not imposed by the trial court constituted an abuse of its sound discretion.

Judgment affirmed.

GREENE, P. J., and FLANIGAN, J., concur.